11YELVERTON, Judge.
David Karam was killed shortly before daylight on September 3,1987 when the pickup truck he was driving south on South Thompson Road in Calcasieu Parish hit the lead locomotive on a 70-car freight train going east. Karam’s widow, suing for herself and on behalf of their two minor children, named five defendants: Missouri Pacific Railroad Company, Farmer’s Land and Canal Company, Inc., the Calcasieu ^Parish Police Jury, the Louisiana Department of Transportation and Development (DOTD), and Gravity Drainage District # 7 of Ward 8 of Calcasieu Parish. The plaintiffs settled with the railroad and the DOTD and these two defendants were released. Farmer’s Land and Canal Company, Inc., was dismissed voluntarily. The plaintiffs went to trial against the Calcasieu Parish Police Jury and the Gravity Drainage District. The Gravity Drainage District obtained a dismissal of the ease against it at the close of the plaintiffs’ evidence. After a trial against the remaining defendant, the trial judge found that the Police Jury was not at fault and rendered judgment finally dismissing the suit. From this judgment the plaintiffs have appealed the finding that the Police Jury was not at fault. We affirm.
Many facts were stipulated. South Thompson Road was a parish road with a right of way of 60 feet. The speed limit was 55 m.p.h. The accident happened at 5:15 a.m. The deceased was driving south and the train was going generally east by northeast. The speeds of the two vehicles were stipulated as well: the train was going 28 m.p.h. and the pickup truck 50-55 m.p.h. There was an advance warning sign erected by the parish 750 feet north of the crossing, notifying highway traffic of the railroad crossing. There was a crossbuck sign present at the track for southbound traffic on the highway. Finally, it was stipulated that in the year 1964 the Police Jury of Calcasieu Parish passed a resolution requesting Missouri Pacific to put warning signals up at this crossing due to the hazardous condition existing at the crossing.
In written reasons for judgment the trial judge noted that Karam was in a hurry to get to work. The record reflects that he was driving a route familiar to him, having driven it at that hour of the morning many times for at least |gtwo years prior to the accident, en route from his home in Kinder to his place of work in Cameron, ¿ distance of nearly 70 miles. He left his house in Kinder that morning at ten minutes to five and was expected to be at work by 6 a.m. The trial judge found that the pickup never applied its brakes before impact. The trial judge emphasized that the deceased had the benefit of the advance warning sign 750 feet from the crossing and the crossbuck sign at the crossing itself.
The plaintiffs’ case against the Poliee Jury was its alleged failure to maintain and sign a hazardous crossing. The plaintiffs sought to show that the presence of the crossbuck sign and the early warning sign were insufficient to adequately warn motorists of the dangerous character of this intersection. They tried to show that trees and other vegetation near the intersection obscured the view of drivers on the parish road, and that drivers *453 could not see a train at these speeds until it was too late. They urged that the Police Jury, considering the presence of the view-obstructing trees, foliage and undergrowth, and considering its awareness of the unusual hazard at this crossing since as far back as the year 1964, owed a duty to travelers on this parish road to either remove the sight obstructions or, in the alternative, erect additional warning signs, specifically a reduced speed limit on that highway and a stop sign at the railroad track.
The trial judge found that plaintiffs had failed to prove that there were sight obstructions which prevented drivers from seeing the train. The trial judge found that the train on this track was visible on the highway 375 feet from the crossing, which was time enough for Karam to have stopped. On these findings the trial judge concluded that the damages resulting from Karam’s death were not the fault of the Police Jury.
|/The finding that there was no obstruction to the deceased’s view of the approaching train that morning eliminates any basis on which it might be said that the Police Jury violated a duty to the deceased. Whether there was an obstruction of view is a question of fact. Our review of this finding of fact is limited by the clearly-wrong, manifest-error standard of review. Stobart v. State of Louisiana, through DOTD, 617 So.2d 880 (La. 1993). We have reviewed the record in its entirety, and we find no basis for setting aside the trial court’s finding of fact.
The evidence at the trial consisted principally of the stipulations, the testimony of eighteen persons, seven of whom were by depositions, two videotapes, and a number of photographs. Among the “live” witnesses there were two expert traffic engineers, one for each side. Duane T. Evans was the traffic engineer for the Karams and Richard Flanagan was the expert for the Police Jury.
Mr. Evans, after calculating the sight triangle at that crossing, testified that a driver of a vehicle going south on South Thompson Road at 55 m.p.h. would have to see the train when the driver was at least 276 feet from the crossing in order to be able to stop. He testified that, based on information furnished to him, including photographs introduced in evidence that were taken at 100 foot intervals from 575 feet away from the crossing, a vehicle driver on this road would be closer than 276 feet — around 225 feet or “somewhere in that neighborhood”, before he could see the approaching train on his right, and that he could not react and stop in that distance. He blamed this restrictive sight distance on trees and bushes that were around the intersection. Mr. Evans recognized that South Thompson was Ra secondary road with a low traffic count, and that the train traffic at that crossing was not substantial, only two a day. He admitted that these two criteria militated against the use of a stop sign. Still, he believed that the line of sight limitation was such that approaching traffic would have to reduce speed to 10 m.p.h. or less in order to stop safely once the train became visible. He believed that an engineering study would reinforce these views but he had not done a complete engineering study.
Richard Flanagan, testifying as the Police Jury’s expert in traffic engineering, made a study of the crossing. Using the Manual on Uniform Traffic Control Devices as Mr. Evans had done, and based pretty much on the same data, Mr. Flanagan reached the conclusion that there was no restricted line of sight problem at the crossing, and that neither lower speed limits nor a stop sign were justified. He added that stop signs at railroad crossings were extremely rare, and that unnecessarily low speed limits and stop signs would likely increase the frequency of accidents, not decrease them.
Albert Prater was Assistant Director of Public Works for Calcasieu Parish at the time of the trial. He was working for the Police Jury at the time of the accident, and as one of his duties he was in charge of parish road signs. One of several witnesses who testified about the infrequency of accidents at this crossing, he related that the last car-train accident there was in 1979, and it involved a car traveling in the opposite direction. He conceded that approaching from the north on the highway and looking west on the railroad track, there was considerable growth, but that, based on his knowledge of the crossing and investigation immediately *454 after the accident, there was no reason for the | (¡Police Jury to ask property owners to remove the growth because a motorist could see the train along a sight triangle of 400 feet up the road. He was at the scene one week after the accident, and identified the still photographs taken there and introduced in evidence, as well as a videotape taken in the early morning nighttime hours in October shortly before the trial.
Roger P. Thomas, a State Trooper, was accepted by the court as an expert in accident reconstruction. He testified for the Police Jury. He was at the scene in the early morning hours of October 10,1992, when the videotape was taken at the intersection showing the passage of a Missouri Pacific train. It was 5:26 in the morning. When the video was taken he was standing near the advance warning sign. He was 600 or 700 feet back from the track north of the crossing looking south. He could hear the tram’s whistle, and he could see the locomotive’s light visible through the clearing of the trees when the train was several hundred feet away. By his description, at that point of view the track comes at South Thompson Road at an angle with the train, the track more or less heading in a northeast direction, kind of toward the viewer.
Of the seven depositions which the plaintiffs introduced at the trial, six were those of railroad employees. These depositions had been taken earlier by other counsel in a federal lawsuit between the plaintiffs and the railroad. Four of these deponents were on the train on the morning of this fatal accident. Mark Hale, the engineer, testified that he could see the headlights of the deceased’s vehicle when the train was 500 feet from the crossing. Greg Barlow, the conductor, said that from where he sat on the train he could see the vehicle lights good, 300 or 400 yards away. |7This witness, like all other railroad witnesses, stated that the locomotive’s whistle had been blowing from the time it got to the whistle board. Barlow also said that their “near misses” at that crossing were in the daytime, not at night because of the lights shining bright. Larry Moses, the brakeman, testified that this was not considered a dangerous crossing, being out in the country with not that many trees. He said light and sound were not impeded.
Gilbert Hayhurst, the railroad claims representative, said that the train stopped in 20 ear lengths, after the emergency brake had been hit right at the intersection. The train’s headlight was on bright.
The deposition of Dr. Vincent Prendergast revealed that he did independent consulting work involving railroad operations. He reviewed all of the evidence available to him about this case and was of the opinion that the train should have braked sooner. He also thought that the close proximity of vegetation on the railroad right-of-way was a problem from the train’s standpoint.
The remaining deposition was given by J.S. Hinton, who was in the business of accident reconstruction. He went to the scene within days after the accident. Included in the information on which he based his opinion were reports of the train crew who saw the pickup’s lights through the trees some 1200 feet from the crossing. In his opinion, it was the railroad’s fault, given the overgrowth conditions at the crossing, in thus maintaining the crossing and allowing the excessive speed of this train under those conditions, that was responsible for this accident. He blamed the railroad for the trees and consequent sight restrictions in the railroad right-of-way. He said, “If the [railroad] right-of-way itself had just been cleared off, there’s a very strong, strong possibility that this would have been prevented.” '
|gAs mentioned, the depositions discussed above were taken in a suit against the railroad in federal court. The Police Jury was not a party to that suit. The focus of those depositions was on possible fault of the railroad. The measure by which Police Jury fault can be inferentially gleaned from their context is slight.
In their efforts to prove that this crossing posed an unusual danger to highway motorists, and that the Police Jury had knowledge of the danger, the plaintiffs rely also on a 1964 Police Jury resolution requesting Missouri Pacific to put warning signals up at this crossing due to the hazardous conditions existing at that crossing. This resolution was *455 explained in the testimony of Albert Prater, the Assistant Director of Public Works, and Rodney Vincent, Parish Administrator. Mr. Vincent, a graduate civil engineer, worked for the parish from 1948 until he retired in 1988. He explained that in the 1960’s the Police Jury operated on the ward system and it was common for a Police Jury member representing a particular ward to ask for a resolution to request railroads to put up gates or lights at crossings in that ward. Mr. Vincent testified that before these resolutions were passed no studies were ever done concerning the crossings, and that the standard language in the resolutions declaring that a crossing was hazardous was not based on prior knowledge. These resolutions, according to him, all originated from the elected members of the jury, not from the staff. He stated that these resolutions asking for lights and gates were never successful; no lights or gates were ever put up in response to them. The implication of this testimony was that such resolutions in 1964 did not mean that the Police Jury believed, or had reason to believe, that a particular crossing was unusually hazardous. The | gtrial judge did not mention this evidence in his reasons for judgment, and it is apparent he gave it little or no weight in determining whether the crossing was hazardous to motorists at the time of this accident. The relevance that he assigned the stipulation was not an abuse of discretion.
In our review of this ease, we have studied the testimony in the record and the depositions, as well as the photographs in evidence, and we have viewed the videotapes. There was conflicting evidence on the question of whether a highway driver could see and hear the approaching train in time to stop. It was a reasonable view of the evidence to find that he could. The trial judge gave clear and thoughtful reasons for judgment. For his reasons, and those we have expressed above, we affirm the judgment of the trial court, at appellants’ costs.
AFFIRMED.